UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| SIOUX STEEL COMPANY, *a South Dakota corporation*,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,<br><br>　　　　　　　Defendant. | 4:19-CV-04156-KES<br><br>ORDER DENYING SIOUX STEEL COMPANY'S PARTIAL MOTION FOR SUMMARY JUDGMENT, GRANTING INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA'S MOTION FOR SUMMARY JUDGMENT, AND DENYING INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA'S MOTION TO EXCLUDE EXPERT TESTIMONY AS MOOT |

Plaintiff, Sioux Steel Company, designed and sold hopper bins to its distributor, who then sold the bins to Agropecuaria el Avion (Avion), a Mexican company. *See* Docket 88 ¶¶ 7-9, 20, 22-24. Tragically, on February 2, 2015, one of these bins failed and collapsed, killing two individuals and causing significant product-loss and other related damages. *Id.* ¶¶ 25-26. Based on the underlying events and related insurance coverage disputes, Sioux Steel filed suit against defendant, Insurance Company of the State of Pennsylvania (ISOP), alleging breach of contract (Count I), common law bad faith (Count II), and requesting punitive damages and attorney's fees.[1] Docket 1. Sioux Steel moves for partial summary judgment on Counts I and II. Docket 68. ISOP moves for summary judgment on Counts I and II, as well as on Sioux Steel's

---

[1] Sioux Steel initially brought two other counts (Conversion and Statutory Bad Faith), but stipulated to their dismissal. *See* Docket 1 at 5-6; Docket 62.

request for punitive damages and attorney's fees. Docket 66. ISOP also moves to exclude Elliot Flood's expert testimony. Docket 63. For the following reasons, the court denies Sioux Steel's partial motion for summary judgment, grants ISOP's motion for summary judgment, and denies ISOP's motion to exclude expert testimony as moot.

## I.    Factual Background

The court recites the following undisputed facts:

On February 2, 2015, a thirty-foot hopper bin storing soymeal collapsed, killing two individuals and causing significant product-loss and other related damages. Docket 88 ¶¶ 25-26. Sioux Steel designed, manufactured, and sold this bin to its distributor, who then sold it to Avion. *Id.* at 7-9, 20, 22-24.

Sioux Steel's engineer, Chad Kramer, designed the bin that collapsed on February 2, 2015. *Id.* ¶ 8-9, 25. Kramer was a licensed engineer in the state of South Dakota at the time he designed the bin. *Id.* ¶ 9. In designing the bin, Kramer used his skills and expertise as a licensed professional engineer, including performing engineering activities and preparing drawings, specifications, and shop drawings. *Id.* ¶ 12. Kramer also consulted technical engineering reference materials to design the bin's specifications and made engineering calculations to ensure the bin met such specifications. *Id.* ¶ 13. Sioux Steel retained an engineering firm, KC Engineering, to review Kramer's design for the hopper. *Id.* ¶ 15-16. Specifically, KC Engineering conducted a structural engineering analysis and design review of the bin and approved the

drawings and specifications of the bin. *Id.* ¶¶ 16-18. Both Kramer's and KC Engineering's services constituted engineering activities. *Id.* ¶¶ 14, 19.

ISOP issued Sioux Steel a Foreign Commercial General Liability Coverage Policy. *Id.* ¶ 1. The policy's coverage territory included Mexico and was effective from December 31, 2014 to December 31, 2015. *Id.* ¶¶ 1-2. Sioux Steel notified ISOP of the February 2, 2015 incident within a week. *Id.* ¶ 31. ISOP then retained Park Perales, an independent adjusting firm in Mexico, to investigate the loss. *Id.* ¶ 32. Perales recommended that ISOP retain expert engineers at Engineering Systems, Inc. (ESI) to investigate why the bin collapsed. *Id.* ¶ 33. ISOP agreed and retained ESI to investigate. *Id.* ¶ 34.

ESI issued a report on May 11, 2015, concluding that the "principal cause" of the bin failure was "the lack of consideration or oversight of the hoop stresses effect on the bolted connections of the silo hopper vertical seams." *Id.* ¶ 36 (quoting Docket 67-14 at 20). This oversight, according to ESI, was a "serious engineering oversight" and ESI concluded that the design of the bins' vertical seam bolted connections was "deficient and inappropriate." *Id.* ¶ 38. This engineering error ultimately compromised the structure of the bin. *Id.* ¶ 41. The bin's failure did not result from a construction defect because the "silo was erected on site according to the drawings and specification." *Id.* ¶ 39.

At some point after the May 11, 2015 ESI report, Sioux Steel requested that ISOP not issue a position letter denying coverage until Sioux Steel had a chance to review the report and issue written objections to it. *Id.* ¶ 47. Sioux Steel then submitted written objections, which prompted ISOP to retain a

second engineering firm, EFI, to review the ESI report and Sioux Steel's objections and to provide a second opinion regarding the cause of the bin's failure. *Id.* ¶ 48-49. On July 30, 2015, ISOP issued a reservation of rights letter to Sioux Steel, stating that ISOP will "undertake an investigation and defense of this matter under a reservation of rights . . . ." Docket 67-19 at 1. On September 15, 2015, based on ESI's report, as well as EFI's review of ESI's report, ISOP issued its denial to Sioux Steel stating that the professional liability exclusion applied. *See* Docket 67-20 at 2-3.

On October 22, 2015, Jarrod Muller, a broker for Howalt-McDowell and in turn a broker for Sioux Steel, emailed Sharon Snyder, a Senior Claims examiner who handled the hopper bin failure claims on behalf of ISOP. *See* Docket 85 ¶ 19, 21, 37; *see also* Docket 84 at 19 (replacing "Snyder" with "ISOP" for purposes of quoting Sioux Steel's brief). In this email, Muller objected to ISOP's conclusion that the professional liability exclusion applied and asked ISOP to reconsider its position. Docket 72-24 at 2. Muller also indicated that Sioux Steel was engaged in settlement negotiations with Avion and stated that "Sioux Steel has been *going it alone* and has put a 6 figure offer on the table to compensate the claimant for lost revenue, cost to replace the hopper and for the loss of the material within the hopper." *Id.* (emphasis added). Muller further stated that Sioux Steel and Avion had a meeting scheduled on November 6, 2015 to "meet and make the final settlement offer." *Id.* On November 6, 2015, Muller emailed Snyder again requesting a formal

revaluation of ISOP's position as well as stating that the settlement negotiations had been extended to November 18, 2015. Docket 72-27 at 2.

As a result of the bins' failures, Avion engaged in months of settlement negotiations with Sioux Steel, and the two entities entered into a settlement agreement in March 2016. Docket 88 ¶ 29. Avion never filed a lawsuit against Sioux Steel. *Id.* ¶ 28.

## II.     Applicable Law

"In insurance coverage actions involving diversity of citizenship, state law controls [the court's] analysis of the insurance policy." *Geerdes v. West Bend Mut. Ins. Co.*, 70 F.4th 1125, 1127 (8th Cir. 2023) (quoting *Nat'l Am. Ins. Co. v. W & G, Inc.*, 439 F.3d 943, 945 (8th Cir. 2006)). The state's highest court's decisions on interpreting insurance provisions bind the court. *See GEICO Cas. Co. v. Isaacson*, 932 F.3d 721, 725 (8th Cir. 2019). If the state's highest court has yet to address an issue, the court must predict how the state court would rule. *See id.* at 725-26.

Here, the court is sitting in diversity. Docket 1 at 1-2. The court applies South Dakota substantive law when deciding the South Dakota state-law claims. The parties also agree that the court should apply South Dakota law when interpreting the insurance policy in this case. *See* Docket 1; Docket 70 at 8-9; Docket 77 at 18. Thus, the court applies South Dakota law when determining whether Sioux Steel is covered under the ISOP's insurance policy.

## III.    The Policy

The pertinent parts of the policy are as follow:

SECTION I – COVERAGES
COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

Subject to any deductibles, limitations, terms, conditions, sublimits and exclusions contained in the Declarations, together with any Schedules applicable to this Foreign Commercial General Liability Coverage Part, **we** agree to provide coverage to **you** to the extent herein provided.

1. Insuring Agreement

   a. **We** will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. **We** will have the right and duty to defend the insured against any **suit** seeking those damages. However, **we** will have no duty to defend the insured against any **suit** seeking damages for **bodily injury** or **property damage** to which this insurance does not apply. **We** may, at **our** discretion, investigate any **occurrence** and settle any claim or **suit** that may result . . .

2. Exclusions

   This insurance does not apply to:

   Engineers, Architects or Surveyors Professional Liability[2]

   This insurance does not apply to **bodily injury, property damage** or **personal and advertising injury** arising out of the rendering of or failure to render any professional services by **you** or any engineer, architect or surveyor who is either employed by **you** or performing work on **your** behalf in such capacity.

   Professional services include:

   1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

   2. Supervisory, inspection, architectural or engineering activities.

---

[2] The "Engineers, Architects or Surveyors Professional Liability" was not originally in the policy but added as part of an endorsement. *See* Docket 67-1 at 33.

Docket 67-1 at 8-9, 33 (emphasis in original). Any reference to "you" or "your" refers to the named insured, in this case, Sioux Steel. *Id.* at 3. "We" or "our" refers to ISOP. *Id.* at 1, 3.

## IV.    Discussion

### A. Count I, Breach of Contract

To establish a breach of contract claim, the plaintiff must prove "(1) an enforceable promise; (2) a breach of the promise; and, (3) resulting damages." *Bowes Construction, Inc. v. S.D. Dept. of Transp.*, 793 N.W.2d 36, 43 (S.D. 2010). The parties' briefing focuses on whether ISOP breached its promises to Sioux Steel to indemnify and defend Sioux Steel against Avion. Docket 70 at 9; Docket 77 at 5; Docket 84 at 1-2; Docket 86 at 10, 12-17; *see also* Docket 67-1 at 8 (showing ISOP agreed that it would "pay those sums that [Sioux Steel] becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies[]" and that it had the "right and duty to defend [Sioux Steel] against any suit seeking those damages").

"The existence of the rights and obligations of parties to an insurance contract are determined by the language of the contract, which must be construed according to the plain meaning of its terms." *W. Nat'l. Mut. Ins. Co. v. Gateway Bldg. Sys., Inc.*, 887 N.W.2d 887, 890 (S.D. 2016) (citations omitted). The court must follow the plain meaning of a provision. *See State Farm Fire & Cas. Co. v. Harbert*, 741 N.W.2d 228, 234 (S.D. 2007). If the terms of an insurance contract "are fairly susceptible of different interpretations, the interpretation most favorable to the insured should be adopted." *Culhane v. W.*

7

*Nat'l Mut. Ins. Co.*, 704 N.W.2d 287, 292 (S.D. 2005) (quoting *Nat'l Sun Indust., Inc. v. S.D. Farm Bureau*, 696 N.W. 2d. 45, 48-49 (S.D. 1999)). The mere "fact that the parties differ as to the contract's interpretation does not create an ambiguity." *Ass Kickin Ranch, LLC, v. N. Star Mut. Ins. Co.*, 822 N.W.2d 724, 727 (S.D. 2012) (quoting *Zochert v. Nat'l Farmers Union Prop. & Cas. Co.*, 576 N.W.2d 531, 532 (S.D. 1998)). "[T]he terms of an unambiguous insurance policy cannot be enlarged or diminished by judicial construction." *Berkley Reg'l. Spec. Ins. Co. v. Dowling Spray Serv.*, 860 N.W.2d 257, 260 (S.D. 2015) (quoting *Am. Fam. Mut. Ins. v. Elliot*, 523 N.W.2d 100, 102 (S.D. 1994)).

### 1. Duty to Indemnify

"When an insurer invokes a contract exclusion to disallow coverage, the insurer has the burden of proving that the exclusion applies." *W. Agric. Ins. Co. v. Arbab-Azzein*, 940 N.W.2d 865, 868 (S.D. 2020) (citations omitted). ISOP argues that the professional liability exclusion applies[3] and excludes Sioux Steel from coverage. *See* Docket 77 at 16-19; Docket 84 at 5-16. The professional liability exclusion provides that the insurance "does not apply to bodily injury [or] property damage . . . 'arising out of the rendering of or failure to render any professional services by you or any engineer . . . who is either employed by you or performing work on your behalf in such capacity." Docket

---

[3] ISOP also argues that two other exclusions apply, *see* Docket 77 n. 3-4, but the court declines to address them because these arguments are contained in two skeletal footnotes without any citation to authority. *See Spann v. Lombardi*, 960 F.3d 1085, 1088 (8th Cir. 2020) ("[A] district court does not abuse its discretion by declining to address an argument for summary judgment that is not properly briefed.").

67-1 at 33 (emphasis omitted). The policy further provides that professional services include "[t]he preparing, approving . . . shop drawings, opinions, reports, or drawings and specifications; and . . . engineering activities." *Id.*

Here, the court finds the policy unambiguously excludes coverage. Starting with the exclusion's "professional services" requirement, the record shows that at all relevant times, both Sioux Steel's engineer and KC Engineering were engaged in professional services when designing the hopper bins. *See* Docket 88 ¶¶ 8-9, 12-19. Specifically, designing the hopper bins required Chad Kramer, Sioux Steel's engineer, to use his skills and expertise as a licensed professional engineer, such as making engineering calculations to ensure the bins met certain specifications and creating drawings. *Id.* ¶¶ 12-13. Similarly, KC Engineering, the firm Sioux Steel retained to review Kramer's design and perform work "on [Sioux Steel's] behalf",[4] conducted a structural engineering analysis, reviewed the design of the hopper bins, and approved drawings and specifications. *Id.* ¶¶ 15-16; Docket 67-1 at 33. These activities

---

[4] Sioux Steel objects to the characterization that KC Engineering performed services on Sioux Steel's behalf. *See* Docket 88 ¶ 15. According to Sioux Steel, this characterization is misleading because "it implies that KC Engineering performed services for a third party at Sioux Steel's direction." *Id.* Instead, Sioux Steel clarifies that "[t]he nature of KC engineering's work was to review Sioux Steel's engineering, rather than perform novel engineering for Sioux Steel." *Id.* But Sioux Steel admits that it hired KC Engineering to review Kramer's engineering work, meaning that KC Engineering was still performing engineering services  "on [Sioux Steel's] behalf." Contrary to Sioux Steel's suggestion, nothing about the exclusion's language requires that services performed on behalf of an entity be novel or at the direction of a third party. Thus, by Sioux Steel's factual admission that it hired KC Engineering to perform engineering services, KC Engineering plainly performed such services on Sioux Steel's behalf.

are all "engineering activities" and thus constitute "professional services" under the professional liability exclusion. *See* Docket 67-1 at 33. Additionally, the writings and drawings related to the hopper bins that Kramer and KC Engineering either drew or approved independently constitute professional services. *See id.* In short, Kramer's and KC Engineering's engineering activities and drawings meet the exclusion's "professional services" requirement.

Turning to the exclusion's "aris[e] out of rendering of or failure to render" requirement, the record shows, and Sioux Steel admits, that the "principal cause" of the hopper bin's failure was an engineering error that Kramer committed and that KC Engineering failed to identify while designing the hopper. *See id.*; Docket 88 ¶¶ 36-38, 40; *see also* Docket 86 at 4, 6. Specifically, the design of the silos' vertical seam bolted connections was deficient and inappropriate because it "compromised the structural integrity of the hopper bin." Docket 88 ¶¶ 38, 41. Kramer and KC Engineering had either incorrectly calculated or failed to identify the miscalculation of the loads, stress, and strength of the vertical seam needed to maintain the hopper bin's integrity. *Id.* ¶¶ 41, 42. Both parties agree that this failure, by both Kramer and KC Engineering, caused the hopper bin to collapse. *Id.* ¶¶ 36-43. Crucially, it is undisputed that the hopper's collapse was not caused by a construction defect because the "silo was erected on site according to the drawings and specification." *Id.* ¶ 39 (quotation omitted). Thus, the court finds that the hopper bin's collapse "ar[ose] out of" Kramer's and KC Engineering's "rendering

10

of or failure to render" professional services. *See* Docket 67-1 at 33. The professional liability exclusion plainly applies.

Sioux Steel resists this straightforward analysis for two principal reasons. First, Sioux Steel argues that the exclusion cannot apply to this case because this case ultimately centers on a defective product rather than engineering services, and that "any professional service rendered by Sioux Steel or KC Engineering in the design, review, or production phase of the manufacturing was merely incidental to the product sold." *See* Docket 70 at 11, 13, 21-22. Second, Sioux Steel argues that the exclusion only applies if the professional services were rendered *to the injured party* (in this case, Avion). *See id.* at 24-25; Docket 86 at 8-10, 12-17; Docket 93 at 5-9. The court addresses these arguments in turn.

Starting with Sioux Steel's first argument, to the extent Sioux Steel seeks a carve-out for manufacturers in determining whether the professional liability exclusion applies, the court finds no support for such a position in the policy's text. Nowhere in the exclusion's language does it suggest that a different test should apply in manufacturer cases compared to others. Docket 67-1 at 33. Instead, the text expressly states the exclusion applies if the damage "aris[es] out of the rendering of or failure to render any professional services by you or any engineer . . . who is either employed by you or performing work on your behalf in such capacity." *Id.* (emphasis omitted). The South Dakota Supreme Court has strongly suggested that this language focuses on whether there is a causal relationship between the damage and the professional services. *See W.*

11

*Nat'l Mut. Ins. Co. v. Gateway Bldg. Sys., Inc.*, 887 N.W.2d 887, 892 (S.D. 2016).

In *Gateway*, a mill company hired Gateway to construct grain bins, a top fill system, and a reclaim system. *Id.* at 888-89. Eventually, the bins became unstable, and the mill company had to empty the bins and sell the grain that had been placed in the bins. *Id.* at 889. The mill company sued Gateway, alleging that Gateway negligently performed its engineering and surveying services, breached implied warranties, and breached its contract. *Id.*

Gateway's insurance company argued that a nearly identical professional liability exclusion applied and thus barred the mill company from receiving coverage. *See id.* at 892. But the South Dakota Supreme Court rejected this argument, noting the record contained various disputes in fact as to the reason why the bins shifted, such as inadequate placement of the bins or failed engineering practices. *See id.* at 890-92. Specifically, the court noted that "[w]hether engineering is the ultimate cause of the damages is in dispute, and therefore summary judgment is premature on the 'professional services' exclusion." *Id.* at 892. The Supreme Court repeated this causation framework in a case one year later, concluding that an identical professional service exclusion applied "[b]ecause any alleged property damage in this case was caused by a professional service[.]" *W. Nat'l Mut. Ins. Co., v. TSP, Inc.*, 904 N.W.2d 52, 59 (S.D. 2017), *overruled on other grounds by Sentell v. Farm Mut. Ins. Co. of Lincoln Cty.*, 956 N.W.2d 826, 835 (S.D. 2021).

12

Thus, contrary to Sioux Steel's argument, the court finds based on the exclusion's language and the South Dakota Supreme Court's interpretation of nearly identical language that the "analytical framework" for determining the professional liability exclusion's applicability is whether the professional services rendered caused the damage. *See* Docket 93 at 7. The court recognizes that *TSP* did not deal with the precise issue in the instant case but rather dealt primarily with the proper interpretation of "professional services" (whether land surveying constituted professional services) and whether the status of the entity performing the land surveying as a subcontractor mattered for purposes of determining the exclusion's scope. *TSP, Inc.*, 904 N.W.2d at 58-59. But both *Gateway* and *TSP* reaffirm the plain language of the exclusion by focusing the ultimate inquiry on whether the professional service caused the damage.

Perhaps sensing this conclusion, Sioux Steel seeks support in a Wisconsin Court of Appeals case, *Leverence v. U.S. Fid. & Guar.*, 462 N.W.2d 218 (Wis. Ct. App. 1990), *overruled on other grounds by Wenke v. Gehl Co.*, 682 N.W2d 405, 271 (Wis. 2004), in which the court found a nearly identical professional liability exclusion not to apply. Docket 70 at 12-13; Docket 86 at 16. In *Leverence*, occupants of homes manufactured by a homebuilder sued the homebuilder and an inspection service based on negligence and strict liability, because of the homes' excessive moisture within the exterior walls. *See* 462 N.W.2d at 221-22. The plaintiffs "allege[d] that the excessive moisture resulted from the defective design of the walls and roofs, inappropriately selected building materials and faulty construction practices." *Id.* at 222. The

13

home manufacturer's insurance company argued that an identical professional liability exclusion applied because the damages flowed from professional services (designing a home). *See id.* at 226.

The *Leverence* court rejected the insurance company's argument, however, "because the claims arise out of manufacture of an allegedly defective product and not malpractice in rendering of a professional service." *Id.* The court further noted that the analysis should focus on the " 'end product,' not each step in the process that leads to the end product." *Id.* at 227. Applying this rule, *Leverence* noted that "[a]lthough the homes' design allegedly contributed to the claimed injuries, the primary objective of Tri–State's operations was the production of a prefabricated home, not a design of a home." *Id.* Thus, according to *Leverence*, the professional service exclusion did not apply. *Id.*

Sioux Steel argues that the reasoning in *Leverence* applies equally here, because Sioux Steel's ultimate objective was to produce hopper bins, not to sell engineering services. Docket 70 at 12-13. But the Wisconsin Supreme Court's discussion of *Leverence* in *Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 84-85 (S.D. 2004) makes clear that *Leverence* lends no support to Sioux Steel. In *American Girl*, a soil engineering subcontractor gave faulty advice to a general contractor regarding a warehouse construction project. *See* 673 N.W.2d at 69-70. Eventually, the warehouse began to sink, resulting in significant damage to the building. *See id.* at 71. It was "undisputed that [the engineer's] inadequate soil engineering advice was a substantial factor in causing the

14

excessive soil settlement and resulting property damage to the [warehouse]." *Id.*
at 84. Thus, *American Girl* concluded that "by its terms," the professional
liability exclusion applies because "the liability . . . ar[ose] out of the rendering
of professional services[.]" *Id.*

The general contractor in *American Girl*, seeking coverage, explicitly
argued that the *Leverence* decision compelled a different result. *Id.* But the
Wisconsin Supreme Court distinguished its facts from those in *Leverence*. *See
id.* at 85. The Court observed that in *Leverence*, the "professional services
inextricably combined with the manufacturing services to produce the claimed
injury[,]" and thus the court worried about the "analytical dilemma" of
determining whether the liability arose from the professional services or from
the manufacturing services. *Id.* In contrast, in *American Girl*, "it [was]
undisputed that flawed professional soil engineering services were a
substantial factor in causing the excessive soil settlement and resultant
property damage to the [warehouse]." *Id.* Thus, *American Girl's* discussion of
*Leverence* reinforces the understanding that the relevant question in this
inquiry is whether the professional services caused the damages. And just like
*American Girl*, where it was undisputed that the professional services were a
"substantial factor" in causing the damage, here it is undisputed that Kramer's
and KC Engineering's failure caused the hopper bin to collapse. Docket 88
¶¶ 36-43.

The facts here are not such that the engineering design is "inextricably
combined" with the manufacturing or construction of the bin. *See American*

*Girl*, 673 N.W.2d at 85. As such, this case does not pose the "analytical dilemma" that *Leverence* was worried about. *Id.* Instead, this case is analogous to *American Girl*, and thus the court rejects Sioux Steel's argument that *Leverence* requires a result that collides with the policy's express text. *See id.*

Sioux Steel's reliance on this court's previous decision in *Gen. Cas. Co. of Wis. v. Nelson Eng'r Consulting, LLC*, 91 F.Supp.3d 1168 (D.S.D. 2015) similarly falls short. In *Nelson*, the court declined to find the professional liability exclusion necessarily applied because the allegations against Nelson Engineering, if true, could have involved a mix of professional and non-professional services such that the potential cause of the damages may have been from the non-professional services rather than the professional ones. *See* 91 F.Supp.3d at 1175-76. But in the instant case, this mixture does not exist. Both parties agree that the engineering failures caused the bins' failures. *See* Docket 88 ¶¶ 36-43; *see also* Docket 86 at 4. In short, the court finds the facts in *Leverence* and *Nelson* to be distinguishable and finds the professional liability exclusion plainly applies.

Sioux Steel next warns that if this court were to find the engineering in this case to fall under the professional liability exclusion, then this "staggeringly broad" application "would effectively negate coverage for nearly all manufacturers of products." *See* Docket 70 at 14. Relatedly, Sioux Steel argues that this interpretation would effectively render this contract to be illusory. *See id.* at 14-15; Docket 93 at 11-13. But Sioux Steel's concern is exaggerated: the exclusion's requirement that the damage "aris[e] out of" the rendering of

16

professional services cabins the exclusion's reach, because the exclusion only applies if the professional services *caused* the damage. *See* Docket 67-1 at 33; *see also Gateway*, 887 N.W.2d at 892; *TSP*, 904 N.W.2d at 59. For example, suppose the engineers in this case provided accurate designs for the hopper bins, but instead the builders improperly constructed them. Suppose also that this improper construction caused the bins to fail. In this hypothetical, even though engineers played a role in the products' construction, the professional services exclusion would not apply because it was not the engineering services that caused the bins' failures, but rather the improper construction. *See TSP*, 904 N.W.2d at 58 (noting that the professional services endorsement "should not apply to construction work performed by contractors" because such work involves "the execution of a decision based on non-professional judgment"). Thus, the exclusion does not swallow coverage and similarly does not make the contract illusory. The court rejects Sioux Steel's policy argument.

The court turns to Sioux Steel's second primary argument for why the professional liability exclusion does not apply—that the exclusion only applies if the professional services were rendered to the injured party. *See* Docket 86 at 8-10, 12-17; Docket 93 at 5-9. Under Sioux Steel's argument, the exclusion's language—that the damage "aris[e] out of the rendering of or failure to render any professional services by you or any engineer . . ."—requires that there be direct privity between the entity that rendered the service (here, Sioux Steel) and the injured party (here, Avion). *See* Docket 86 at 8-10, 12-17; *see also* Docket 70 at 25-27; Docket 67-1 at 33. Effectively, Sioux Steel argues that the

17

court should add the phrase "to the injured party" in between the words "render" and "any" in the exclusion, such that the exclusion would apply if the damage "aris[es] out of the rendering of or failure to render *to the injured party* any professional services by you or any engineer . . . who is either employed by you or performing work on your behalf in such capacity."

But "the terms of an unambiguous insurance policy cannot be enlarged or diminished by judicial construction." *Berkley*, 860 N.W.2d at 260 (quotation omitted). Yet, that is precisely what Sioux Steel seeks. Nothing in the exclusion requires direct privity between the entity that rendered professional services and the injured party. The court declines to re-write the exclusion to provide otherwise.

Seeking to avoid this fatal pitfall, Sioux Steel next seizes on the exclusion's use of the term "render," and argues that the term's dictionary meaning, as well as plain and ordinary meaning, is to "furnish for consideration." *See* Docket 86 at 9 (citing *Render, Merriam-Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/render (last accessed Dec. 21, 2023)). According to Sioux Steel, this understanding properly frames the inquiry as being "whether Sioux Steel or anyone in its employ, including KC Engineering, performed, provided, or otherwise furnished any of the listed services for consideration to Agropecuaria el Avion." *Id.* Because the answer is "clearly" no, Sioux Steel argues the exclusion cannot apply in this case. *See id.*

While the South Dakota Supreme Court allows courts to refer to dictionary definitions to aid in determining an undefined word's meaning in a contract, neither Sioux Steel's proposed definition of "render," nor any of the definitions the court has reviewed, compel Sioux Steel's conclusion. *See Jackson v. Canyon Place Homeowner's Ass'n, Inc.*, 731 N.W.2d 210, 213 (2007). Starting with Merriam-Webster's unabridged version, in addition to including "to furnish for consideration," as one definition, this dictionary also includes "to hand over to another (as the intended recipient)" to "deliver," or to "transmit." *See Render*, *Unabridged Merriam-Webster's Online Dictionary*, https://unabridged.merriam-webster.com/unabridged/render (last visited December 21, 2023). Similarly, Black Law's dictionary defines "render" as "[t]o transmit or deliver." *Render*, *Black Law's Dictionary*, (11th ed. 2019). Oxford Dictionary defines render as to "[p]rovide or give (a service, help, etc.)[.]" *Render*, *Oxford Dictionaries*, https://premium.oxforddictionaries.com/definition/american_english/render (last visited December 21, 2023).

These definitions, considered together, show that to "render" something means to "give" something. And here, Kramer and KC Engineering gave their engineering services to Sioux Steel, and those engineering services caused the bins' failures. *See* Docket 88 ¶¶ 8, 15-16 (showing Sioux Steel either employed or retained Kramer and KC Engineering to perform engineering services); *id.* ¶¶ 36-43 (showing causation); *see also* Docket 86 at 4. Thus, Kramer and KC Engineering's actions fall squarely within the exclusion's language. *See* Docket

67-1 at 33. Even if the court limited its understanding of render to Sioux Steel's definition— "to furnish for consideration,"—the facts of this case align with such definition. Kramer and KC Engineering furnished their engineering services for consideration (however "consideration" should be understood) to Sioux Steel because Sioux Steel asked Kramer and KC Engineering to provide their services, and those engineering services caused the bins' failures. *See* Docket 88 ¶¶ 8, 15-16, 36-43; *see also* Docket 86 at 4. In the context of the professional liability exclusion, nothing about the definition of "render" requires that Kramer or KC Engineering rendered their engineering services to Avion. The court rejects Sioux Steel's dictionary-based argument.

Sioux Steel next argues that none of the cases ISOP cites involve situations in which the injured party is not in direct privity with the party rendering professional services. *See* Docket 86 at 9-10; Docket 93 at 7 ("Every case cited by ISOP is distinguishable for the same reason: in each of those cases, the insured or an agent of the insured rendered a professional service to the injury party."). While that may be true, Sioux Steel has failed to show why that difference matters, given the exclusion's plain language. In fact, multiple courts have explicitly rejected Sioux Steel's privity argument. *See, e.g.*, *Assurance Co. of Am. v. Am. Registry of Radiologic Technologists*, 64 F. Supp.3d 1289, 1301 (D. Minn. 2014) ("Absent any policy language to the contrary, privity between the insured and the claimant is not a required element for a professional services exclusion to apply."); *Hurst-Rosche Eng'rs., Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1338-40, 43-45 (7th Cir. 1995)

20

(finding identical professional services exclusion applied to general contractor's claims against insured for libel and tortious interference even though insured was hired by Housing Authority to submit weekly reports, not by general contractor); *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 984 (3d Cir. 1988) ("[T]urning to the plain and ordinary meaning of the term, we have not found nor has there been brought to our attention anything to suggest that [an identical exclusion] embodies a privity requirement.").

The Eleventh Circuit's decision in *Witkin Design Grp., Inc. v. Travelers Prop. Cas. Co. of Am.*, 712 F.Appx. 894 (11th Cir. 2017) is also instructive. In *Witkin*, the estate of an 11-year-old boy sued a landscape architecture firm in a wrongful death suit arising from a traffic accident, alleging that the architecture firm negligently designed and built an intersection for a residential community. *See id.* at 895. The Eleventh Circuit noted that the record was unclear about which entity hired the architecture firm, and instead "assume[d]" that the developer of the residential community did so. *See id.* at 897 n.3. Even with this ambiguity in the record, however, the court held that "[t]he conduct of [the architecture firm] in designing and constructing the intersection falls squarely within the professional services exclusions." *Id.* at 897. The fact that the Eleventh Circuit decided the case after assuming the developer hired the architecture firm underscores the irrelevance of whether there is direct privity between the injured party and the entity who performed the professional services.

21

The court joins these other courts in finding that the professional services exclusion's unambiguous language applies in situations such as the one presented here, where the insured rendered professional services to an entity, and later a third-party claimant—without contractual privity to the insured—sustained injuries because of the insured's professional services. Thus, the court rejects Sioux Steel's second principal argument.

In summary, the undisputed record here establishes that the hopper bin failed because of Kramer and KC Engineering's ineffective engineering services. *See* Docket 88 ¶¶ 36-43. The professional liability exclusion plainly applies because the bin's failure "ar[ose] out of the rendering of or failure to render any professional services by . . . any engineer . . . who is either employed by [Sioux Steel] or performing work on [Sioux Steel's] behalf in such capacity." Docket 67-1 at 33. Because the policy unambiguously[5] excludes coverage, the court finds ISOP had no duty to indemnify and thus did not breach its promise to Sioux Steel with respect to coverage.

### 2. Duty to Defend

An insurance company's lack of duty to indemnify does not necessarily mean it lacked a duty to defend. *See North Star Mut. Ins. v. Korzan*, 873 N.W.2d 57, 61 (S.D. 2015) ("An insurer's duty to defend and its duty to indemnify are

---

[5] Sioux Steel repeatedly references an AIG Senior Underwriter, Lea Austin's, opinion regarding the intent of the professional liability exclusion. *See* Docket 70 at 14, 16, 23. But because the court finds the contract is unambiguous, the court does not consider this extrinsic evidence. *See Kernelburner, L.L.C. v. MitchHart Mfg., Inc.*, 765 N.W.2d 740, 742 (S.D. 2009).

separate and independent duties."). The duty to defend is broader than the duty to indemnify. *Lowery Constr. & Concrete, LLC v. Owners Ins. Co.*, 901 N.W.2d 481, 484 (S.D. 2017). Indeed, "[t]he duty to defend arises prior to the completion of litigation, and therefore insurers are required to meet their defense obligation before the scope of the insured's liability has been determined." *Id.* (quoting 14 Steven Plitt et al., *Couch on Insurance* § 200:3 (3d ed.)). On the other hand, "[i]t is well settled that a duty to defend does not exist when an insurer shows 'the claim *clearly* falls outside of policy coverage.' " *Geidel v. De Smet Farm Mut. Ins. Co. of S.D.*, 926 N.W.2d 478, 484 (first emphasis in original; emphasis on "policy coverage" omitted) (quoting *N. Star Mut. Ins. Co. v. Kneen*, 484 N.W.2d 908, 912 (S.D. 1992)); *see also Lowery*, 901 N.W.2d at 484.

ISOP argues that its duty to defend was never triggered because the policy only requires ISOP to defend a "suit," and there was no suit pending against Sioux Steel. *See* Docket 77 at 14-16; Docket 84 at 17-21. The policy provides:

> We will have the right and duty to defend the insured against any **suit** seeking those damages. However, we will have no duty to defend the insured against any **suit** seeking damages for **bodily injury** or **property damage** to which this insurance does not apply.

Docket 67-1 at 8 (emphasis in original). The policy further defines a "suit" as:

> [A] civil proceeding in which damages because of **bodily injury, property damage** or **personal and advertising injury** to which this insurance applies are alleged. **Suit** includes:

23

> a. an arbitration proceeding in which such damages are claimed and to which the insured must submit, or does submit with **our** consent; and
>
> b. any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with **our** consent.

*Id.* at 7 (emphasis in original).

Under the policy's express language, Sioux Steel must have faced a "suit" to trigger ISOP's duty to defend. *Id.* at 8. Here, although Sioux Steel advised ISOP that Avion verbally threated to bring a lawsuit against Sioux Steel, Sioux Steel admits that Avion never filed a lawsuit against Sioux Steel. *See* Docket 88 ¶¶ 27-28. Thus, there is no "civil proceeding in which damages because of bodily injury, property damage or personal and advertising injury to which this insurance applies are alleged." Docket 67-1 at 7.

Sioux Steel argues that this lack of lawsuit is not dispositive because Avion and Sioux Steel engaged in settlement negotiations with Avion. *See* Docket 70 at 18; Docket 88 ¶ 29. The policy recognizes that a "suit" includes "any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent." Docket 67-1 at 7 (emphasis omitted). But informal settlement negotiations that precede the commencement of any civil proceeding do not constitute an "alternative dispute resolution proceeding." *See Meyers Warehouse, Inc. v. Canal Indem. Co.*, 614 F.Appx. 719, 722 (5th Cir. 2015) (interpreting identical insurance provision and holding informal settlement negotiations did not trigger duty to defend). Sioux Steel has not pointed to anything in the record to suggest that Sioux Steel was

24

contractually obligated to enter into these negotiations with Avion or that ISOP directed Sioux Steel to enter into such negotiations. To the contrary, Sioux Steel acknowledges in its own briefing that "in an effort to mitigate risk, *[Sioux Steel] initiated a settlement agreement* with Avion which finalized on March 18, 2016." Docket 70 at 20 (emphasis added). Further, Sioux Steel's own general counsel, Amy Ellis, testified in her deposition that Sioux Steel did not submit to any type of alternative dispute resolution proceeding. *See* Docket 73-2 at 4. Thus, Sioux Steel's informal settlement negotiations with Avion do not constitute a "suit" because they are not an "alternative dispute resolution proceeding." *See* Docket 67-1 at 7.

Even if settlement negotiations constitute "any other alternative dispute resolution proceeding," the record shows that ISOP did not give Sioux Steel "consent" to submit to these settlement negotiations as required under the policy. *See id.* Muller, Sioux Steel's broker during all relevant times, emailed ISOP's claim manager, Snyder, on October 22, 2015, within six months of Sioux Steel's settlement with Avion. *See* Docket 85 ¶¶ 19, 21, 35, 47; Docket 84 at 19 (replacing "Snyder" with "ISOP" for purposes of quoting Sioux Steel's brief); Docket 88 ¶ 29 (not disputing that Sioux Steel and Avion settled on March 18, 2016). In this email, Muller objected to ISOP's conclusion that the professional liability exclusion applied and asked for ISOP to reconsider its position. Docket 72-24 at 2. In doing so, Muller then explained that "Sioux Steel has been *going it alone* and has put a 6 figure offer on the table to compensate the claimant for lost revenue, cost to replace the hopper and for

25

the loss of the material within the hopper." *Id.* (emphasis added). Muller further stated that Sioux Steel and Avion had a meeting scheduled on November 6, 2015 to "meet and make the final settlement offer." *Id.* Muller emailed Snyder again on November 6, 2015, requesting a formal revaluation of ISOP's position as well as stating that the settlement negotiations had been extended to November 18, 2015. Docket 72-27 at 2.

At no point in any of these emails did Muller, on behalf of Sioux Steel, ask Snyder or any other ISOP representative for permission to engage in these settlement negotiations. Dockets 72-24; Docket 72-27. Nor did Snyder ever give consent to such discussions. *Id.* Instead, Muller's real-time statement that Sioux Steel had been "going it alone" shows that ISOP was not involved during these settlement negotiations, which in turn strongly suggests that ISOP did not consent to such discussions. *See* Docket 72-24 at 2. Sioux Steel appears to acknowledge this reality when it states in its brief that "ISOP refused to defend, indemnify, or *assist Sioux Steel in any capacity in negotiating with Avion.*" Docket 86 at 18 (emphasis added). In short, the court finds that Sioux Steel never faced a "suit" under the policy's definition, both because informal settlement negotiations do not constitute an alternative dispute resolution proceeding and even if they did, ISOP did not consent to such negotiations. Thus, ISOP did not have a duty to defend Sioux Steel. *See* Docket 67-1 at 8.

None of Sioux Steel's arguments persuade the court otherwise. First, Sioux Steel highlights other provisions of the policy, such as the portion of the

policy that discusses an insured's duties. *See* Docket 70 at 18. This section of the policy provides:

> b. If a claim is made or suit is brought against any insured, you must:
>
>> (1) Immediately record the specifics of the claim or suit and the date received; and
>> (2) Notify us as soon as practicable.
>
>> You must see to it that we receive written notice of the claim or suit as soon as practicable.
>
> c. You and any other involved insured must:
>
>> (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit[.]

Docket 67-1 at 23 (emphasis omitted). According to Sioux Steel, "it is clear from this requirement that the insurer contemplated the issuance of a demand letter by a third party as an event which triggers, their duty to defend Sioux Steel." *See* Docket 70 at 19. While the court must interpret the policy provisions in reference to the policy as a whole, *Nelson v. Farmers Mut. Ins. Co. of Neb.*, 684 N.W.2d 74, 77 (S.D. 2004), this provision supports the distinction between a claim and a suit. The fact that this section describes both a "claim" and a "suit" leads this court to conclude that these terms are not interchangeable because if they were, there would be no reason to list both. *See Estate of Fisher v. Fisher*, 645 N.W.2d 841, 846 (S.D. 2002) ("A contract should not be interpreted in a manner that renders a portion of it meaningless."). Here, while Sioux Steel may have been faced with a claim, it was not subject to a suit under the policy's definition. Thus, the court rejects Sioux Steel's first argument.

Second, Sioux Steel cites *Sacred Heart Health Servs. v. MMIC Ins., Inc.*, 575 F. Supp. 3d 1137 (D.S.D. 2021), arguing that *Sacred Heart* compels the conclusion that ISOP breached its duty to give equal consideration to Sioux Steel's interest, which in turn caused Sioux Steel to broker its own settlement with Avion. *See* Docket 86 at 10-11. But *Sacred Heart* involved a situation where there was an underlying suit filed against the insured. *See Sacred Heart*, 575 F. Supp. 3d at 1149. Furthermore, in *Sacred Heart,* the insurer had the right to determine whether to settle the third-party claim against the insured, and in that context, the court held that the insured sufficiently stated a claim against the insurer that the insurer failed to give equal consideration to the insured during settlement negotiations with the third-party. *See id.* at 1147, 73. Here, Sioux Steel has not shown that ISOP had any involvement with settlement negotiations between Sioux Steel and Avion. To the contrary, Sioux Steel engaged in such negotiations independent of ISOP. *See* Docket 72-24 at 2. *Sacred Heart* does not help Sioux Steel here.

Third, Sioux Steel alleges that ISOP indicated it would deny coverage before Avion had ever filed suit, and that by doing so, ISOP incurred a duty to defend. *See* Docket 70 at 19. Sioux Steel warns that "[i]t is illogical to tender a complaint for litigation to a company that has already declined to participate and disavowed any obligation to the insured." *Id.* Sioux Steel further warns that "if an insurer disavows its duty to defend before a suit is filed, the insured is forced to settle, then the insurer never has a duty to defend because a suit was never filed." Docket 86 at 11.

But this argument appears to conflate Sioux Steel with Avion. Sioux Steel fails to explain why Avion's decision to file a suit against Sioux Steel is impacted by ISOP's determination that its policy excludes coverage. Additionally, Sioux Steel does not adequately explain why it is "forced" to settle prior to a suit being filed. Although an insured may determine settling with a third-party before that third-party files a lawsuit is advantageous, an insurer's position that a potential claim is excluded by the policy does not "force" the insured to settle early. Either way, nothing about this argument alters the policy's unambiguous language defining the term "suit." *See* Docket 67-1 at 7-8.

Finally, Sioux Steel argues that it is "fundamentally unfair" that Sioux Steel simultaneously has a duty to mitigate damages while at the same time ISOP has no duty to defend. *See* Docket 70 at 19-20; Docket 86 at 11-12. Instead, Sioux Steel argues, ISOP "shares" the duty to mitigate damages. Docket 86 at 12. Sioux Steel then argues that because it mitigated its risk in initiating a settlement with Avion, ISOP must also help in mitigation efforts. Docket 70 at 20. But this argument conflates mitigating damages from a loss (such as not continuing to drive a car with defective brakes after being in an accident due to such defective brakes) with mitigating a company's potential liability after-the-fact. ISOP may have a duty to mitigate damages just like Sioux Steel. But Sioux Steel has failed to explain why an insured's duty to mitigate damages triggers an accompanying duty to ISOP to defend Sioux Steel, absent Sioux Steel facing a requisite "suit." The court rejects this final

argument. Because Sioux Steel faced no suit against Avion, ISOP had no duty to defend Sioux Steel. Docket 88 ¶ 29. Thus, ISOP did not breach its duty to defend Sioux Steel.

The court further notes that even if Sioux Steel faced a suit, ISOP did not breach its duty to defend because the information available to ISOP at the time that ISOP decided to not defend Sioux Steel showed that the potential claim "clearly f[ell] outside of policy coverage." *Geidel*, 926 N.W.2d at 484 (citation omitted). Based on the review of two independent engineering consultants— ESI's report and EFI's review of ESI's report—ISOP issued its denial to Sioux Steel on September 15, 2015, stating that the professional liability exclusion applied.[6] *See* Docket 67-20 at 2-3. The facts in ESI's report are precisely the same facts the court used above to determine that the professional liability exclusion unambiguously applied to this case, and the policy excluded coverage. *See supra*, at 8-22. Thus, the court finds that at the time ISOP declined to defend Sioux Steel on September 15, 2015, the potential claim clearly fell outside of the policy. For this reason, ISOP did not breach its duty to defend Sioux Steel. *See Geidel*, 926 N.W.2d at 484.

In conclusion, ISOP did not breach its duty to indemnify or defend Sioux Steel. The court grants summary judgement in favor of ISOP on Count I, and similarly denies Sioux Steel's motion for summary judgment on Count I.

---

[6] Unbeknownst to ISOP, Sioux Steel had already determined through its own internal investigation—almost immediately after the bins failed—that the bin failed due to the vertical seams failing, which is consistent with the ESI report. *See* Docket 88 ¶¶ 42-44.

### B. Count II, Bad Faith (Common Law)

Sioux Steel also alleges a common law bad faith claim against ISOP. *See* Docket 1 at 5. The parties first dispute the nature of this count. *See* Docket 86 at 17-18; Docket 92 at 10-11. Sioux Steel argues that it pleaded[7] both first-party and third-party bad faith claims against ISOP. *See* Docket 86 at 17-18. ISOP argues that Sioux Steel only alleges a third-party bad faith claim. *See* Docket 92 at 10-11.

South Dakota law classifies insurance bad faith actions as either first-party or third-party claims. *Bertelsen v. Allstate Ins., Co.*, 796 N.W.2d 685, 700 (S.D. 2011). The South Dakota Supreme Court summarized the differences between these two types of claims:

> A first-party coverage situation arises when an insurance company contracts to pay benefits directly to an insured. First-party bad faith occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured. By contrast, a third-party coverage situation arises when an insurance company contracts to indemnify an insured against liability to third parties.

*Id.* (citations and quotations omitted). At the same time, some jurisdictions recognize that an insurer's refusal to defend an insured against a third-party claim can nonetheless be treated as a first-party bad faith claim. *See* Stephen S. Ashley, *Bad Faith Actions Liability & Damages* § 4:10 (2d ed. 2023) (collecting cases). In such a case, because

---

[7] Sioux Steel references its bad faith claims in both its complaint and amended complaint, but Sioux Steel never filed an amended complaint. *See* Docket 86 at 17. Thus, Sioux Steel's original complaint is operative.

"[a]n insurer's bad faith refusal to defend involves the denial of a benefit that the policy expressly promises to the insured[,] [o]ne ought . . . to determine whether a refusal to defend constitutes bad faith according to first-party bad faith standards, not third-party bad faith standards." *Id.* § 3:1. To do otherwise would to mistakenly "apply third-party bad faith standards in what is essentially a first-party bad faith case arising out of a liability insurance policy." *Id.*

The parties do not direct the court to—and the court is unaware of—a South Dakota Supreme Court decision that allows for breach of duty to defend to be treated as a first-party bad faith claim. The court need not predict how the South Dakota Supreme Court would decide the issue, however, because regardless of whether the court applies first-party or third-party bad faith standards, Sioux Steel cannot show ISOP acted with bad faith.

Starting with the first-party bad faith claim, Sioux Steel alleges that ISOP acted in bad faith because ISOP breached its duty to defend Sioux Steel. *See* Docket 1 ¶¶ 39-43. But as discussed above, the court finds Sioux Steel did not breach its duty to defend because it had no such duty. *See supra*, at 22-30. Thus, this theory fails for establishing a first-party bad faith claim. *See W. Am. Ins. Co. v. Atyani*, 366 F. Supp. 3d 1270, 1282 (D.N.M. 2019) ("[A]s the Insurers had no duty to defend in the underlying lawsuits, they could not have acted in bad faith in reaching that decision.").

Furthermore, to the extent that first-party bad faith claim principles apply to not just ISOP's alleged duty to defend but also its overall handling of Avion's claims against Sioux Steel, the court finds Sioux Steel cannot show first-party bad faith. For first-party bad faith claims, the plaintiff must prove that there was "an absence of a reasonable basis for denial of policy benefits . . . and the knowledge or reckless disregard [of the lack] of a reasonable basis for denial[.]" *Swenson v. Auto Owners Ins. Co.*, 831 N.W.2d 402, 412 (S.D. 2013) (alterations in original) (quoting *Dakota, Minn. & E. R.R. Corp. v. Acuity*, 771 N.W.2d 623, 629 (S.D. 2009); *see also Harvieux v. Progressive N. Ins. Co.*, 915 N.W.2d 697, 701 (S.D. 2018). First-party bad faith "can extend to situations beyond mere denial of policy benefits." *Dakota*, 771 N.W.2d at 629 (citation omitted); *see also Hein v. Acuity*, 731 N.W.2d 231, 236 (S.D. 2007). For example, a first-party bad faith claim may be based on a "failure to comply with a duty under the insurance contract," but still must involve "an insurance company consciously [engaging] in wrongdoing." *Dakota*, 771 N.W.2d at 629 (citation omitted).

Ultimately, an insurance company "will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis." *Dakota*, 771 N.W.2d at 630 (quoting *Walz v. Fireman's Fund Ins. Co.*, 556 N.W.2d 68, 70 (S.D. 1996)). Thus, "[i]f an insured's claim is fairly debatable either in fact or law, an insurer cannot be said to have denied the claim in bad faith." *Id.* at 630 (quoting 46A C.J.S. Insurance § 1873 (2008)). Courts view an insurer's actions and decisions to deny a claim "at the time the

insurer made the decision to deny or litigate the claim, rather than pay it." *Id.* Although determining whether an insurer acted in bad faith is generally a question of fact, *id.* at 629-30, the South Dakota Supreme Court has affirmed summary judgment in favor of the insurer when the insurer correctly denied coverage, *see Swenson*, 831 N.W.2d at 412.

Here, at the time ISOP denied coverage, ISOP had relied on ESI's report, as well as EFI's review of ESI's report. *See* Docket 67-20 at 2-3. ISOP stated its position that the professional liability exclusion applied. *See id.* Because the court finds that this conclusion was correct, there was not "an absence of a reasonable basis for denial of policy benefits." *Swenson*, 831 N.W.2d at 412. Thus, Sioux Steel fails on a first-party bad faith claim.

Turning to a third-party bad faith claim, such a claim "arises when an insurer *wrongfully* refuses to settle a case brought against its insured by a third-party." *Hein*, 731 N.W.2d at 235 (emphasis added). An insurer commits third-party bad faith when it breaches its duty to give equal consideration to the interests of its insured when deciding to settle a case. *Id.* Here, Avion never filed a lawsuit against Sioux Steel. *See* Docket 88 ¶ 28. Furthermore, as discussed above, the record shows that ISOP played no role in Sioux Steel's decision to settle with Avion. *See* Docket 72-24 at 2*;* Docket 86 at 18. The policy also gives ISOP the discretionary right, but importantly no duty, to investigate a claim and settle it. *See* Docket 67-1 at 8. Thus, Sioux Steel cannot succeed on a third-party claim against ISOP because ISOP did not refuse to settle any case against Sioux Steel. *See* Docket 88 ¶ 28.

Even if Sioux Steel could maintain a third-party claim despite these apparent deficiencies, third-party bad faith claims require that the insurance company act "wrongfully." *See Hein*, 731 N.W.2d at 235. But here, because the court finds the professional liability exclusion applies and because ISOP relied on ESI's expert report regarding the cause of the bins' failure when denying coverage, ISOP did not wrongfully deny coverage and did not act in bad faith. *Id.*; *see also* Steven Plitt, et al., *Couch on Insurance* § 205:20 (3d. ed. 2023) (stating that when there is no coverage an insurer cannot have acted in bad faith).

In summary, Sioux Steel cannot show that ISOP acted in bad faith—either under first-party or third-party bad faith standards—because ISOP correctly interpreted the insurance policy and correctly denied coverage.[8] *See Brelian, Inc. v. Liberty Mut. Fire Ins. Co.*, 2010 WL 11575473, *19 (S.D. Tex. 2010) ("Although it may be possible for the insured to recover for a bad faith denial of a claim when the claim is not covered by the policy, as a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered."). The court grants summary judgement in favor of ISOP on Count II and denies Sioux Steel's motion for summary judgment on the same.

---

[8] For this reason, the court need not consider Sioux Steel's argument regarding ISOP's offer to settle with Sioux Steel in exchange for Sioux Steel releasing "all claims under this policy[.]" *See* Docket 72-49; Docket 70 at 28; Docket 93 at 15-16.

### C. Punitive Damages

Because "[p]unitive damages are not available unless a tort has been committed," and because the court dismisses Sioux Steel's bad faith claim, the court grants summary judgment in favor of ISOP on Sioux Steel's request for punitive damages. *See O'Neill v. O'Neill*, 876 N.W.2d 486, 469 (S.D. 2016).

### D. Attorney's Fees

"As a general rule, attorney fees may only be awarded by contract or when specifically authorized by statute." *Biegler v. Am. Fam. Mut. Ins. Co.*, 621 N.W.2d 592, 606 (S.D. 2001) (quoting *City of Sioux Falls v. Kelley*, 513 N.W.2d 97, 111 (S.D. 1994)). SDCL § 58-12-3 authorizes attorney's fees in certain situations for insurance disputes, but they are only available if, in refusing to pay benefits under the policy, the insurer's refusal was "vexatious or without reasonable cause[.]" Additionally, such attorney's fees are only available "if judgment or an award is rendered for plaintiff[.]" *Id.* Here, because ISOP did not act vexatiously or without reasonable cause in denying coverage, and because the court is not entering judgment in favor of Sioux Steel, Sioux Steel cannot recover attorney's fees. The court denies Sioux Steel's request for attorney's fees.

### E. Motion to Exclude

ISOP moves to exclude Elliot Flood's testimony. Docket 63. Sioux Steel opposes this motion. Docket 79. Because the court does not rely on Flood's deposition testimony and because the court grants summary judgment in favor of ISOP, the court denies ISOP's motion as moot.

## V.    Conclusion

For the above reasons, it is ORDERED:

(1) That Sioux Steel's partial motion for summary judgment is (Docket

68) is DENIED;

(2) That ISOP's motion for summary judgment (Docket 66) is GRANTED;

and

(3) That ISOP's motion to exclude Flood's testimony is DENIED as moot.

Dated December 21, 2023.

BY THE COURT:

*/s/ Karen E. Schreier*
UNITED STATES DISTRICT JUDGE